UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT M. EATON, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 18-11824-LTS |
| TOWN OF TOWNSEND, JAMES M. KREIDLER, JR., & GORDON CLARK, | ) ) ) ) ) | |
| Defendant(s). | ) ) | |

ORDER ON MOTION TO DISMISS (DOC. NO. 25)

March 6, 2019

SOROKIN, J.

Robert Eaton has sued the Town of Townsend, the Town Administrator (James Kreidler), and a member of the Board of Selectman (Gordon Clark) for claims arising out of his employment as the Townsend Police Chief. Doc. No. 22.[1] The defendants collectively moved to dismiss part of the Amended Complaint. Doc. No. 25. For the reasons set forth below, the motion to dismiss, Doc. No. 25, is ALLOWED IN PART and DENIED IN PART.

I.  FACTS[2]

In March 2016, Robert Eaton was hired to be the Townsend Police Chief. Doc. No. 22 ¶ 5. He began his official duties on May 1, 2016. Id. ¶ 17. At all relevant times, James Kreidler was the Town Administrator for the Town of Townsend. Id. ¶ 3. Additionally, the Townsend

---

[1] Citations to items appearing on the Court's electronic docket ("Doc. No. __ at __") reference the document and page numbers assigned by ECF.
[2] All facts are derived from the Amended Complaint, Doc. No. 22, and the accompanying documents, Doc. No. 22-1, which the Court accepts as true for purposes of the motion to dismiss.

Board of Selectmen ("BOS"), which is "the chief executive office of the Town of Townsend," was comprised of Gordon Clark, Cindy King, and Carolyn Smart. Id. ¶ 2.

Eaton alleges that shortly after beginning his employment, "Defendants Clark and Kreidler sought to coerce Plaintiff Eaton to take adverse actions against certain current and former employees of the Townsend Police Department." Id. ¶ 19. According to Eaton, these employment actions included demotions and denial of promotions for individuals with whom Kreidler and Clark had personal issues. Id. ¶¶ 20-21. At one point, Kreidler "told Plaintiff Eaton that his office was 'bugged' and that another Selectwomen, [sic] Carolyn Smart, was reading Plaintiff Eaton's emails," which Eaton alleges "was made with the intent to threaten and intimidate" him. Id. ¶ 27. In August 2016, "Defendant Kreidler informed Plaintiff Eaton that the BOS was not satisfied with Plaintiff Eaton's job performance and that he probably would not make his probation period." Id. ¶ 30. Eaton alleges this was done in retaliation for him "refusing to take improper action against past and present members of the Townsend Police Department as requested by Defendants Clark and Kreidler." Id.

On August 29, 2016, Eaton met with Smart. Id. ¶ 31. In this meeting, Eaton expressed his concerns that Kreidler had filed an unmerited complaint against an employee in an attempt to support Clark's personal vendetta. Id. During this meeting, Eaton also "asked Selectwoman Carolyn Smart whether the BOS was satisfied with his performance and she responded that she had no idea why Defendant Kreidler would have told Plaintiff Eaton that he wasn't likely to complete his probationary position." Id. ¶ 32.

In September, Eaton had a meeting with Clark and Kreidler. Id. ¶ 33. During this meeting, Clark and Kreidler again pressured Eaton to take adverse employment actions against various individuals and pressured him "to issue a derogatory and false press release regarding an

2

investigation conducted by the prior Townsend Police Chief." Id. ¶ 34. Eaton refused to comply with either of these demands. Id. ¶ 35. Clark then told Eaton that there was a "large ongoing investigation that is going to shake up the police department," which Eaton understood to be a threat. Id. At the end of this meeting, Eaton spoke to Clark alone. Id. ¶ 36. Eaton told Clark that the actions he had requested Eaton to take were improper, to which Clark "became irate." Id. In November, Kreidler initiated an investigation of Eaton and the Townsend Police Department, alleging improper use of the Massachusetts Criminal Justice Information System ("CJIS"). Id. ¶ 38. Eaton alleges this investigation was initiated in retaliation for him "making various public statements and refusing to issue press releases." Id.

On November 19, 2016, Eaton spoke with Smart and "informed her that Defendant Kreidler had created a toxic work environment that was interfering with Plaintiff Eaton's work environment and was harming Plaintiff Eaton's health." Id. ¶ 40. Eaton alleges that during that conversation, as well as on various other occasions, he "requested the reasonable accommodation that he not be required to communicate with Defendant Kreidler but rather that he report directly to the BOS." Id. Plaintiff Eaton was never granted this accommodation. Id. ¶ 42. Shortly after the November 19 conversation, Kreidler became aware of the complaints and concerns expressed by Eaton to Smart. Id. ¶ 41. According to Eaton, "Defendant Kreidler's harassment towards Plaintiff Eaton noticeably increased" thereafter. Id. A few days later, on November 23, 2016, the BOS issued a press release which stated that Eaton had resigned as police chief and which contained the "false impression that the Townsend police officers were conducting unlawful background checks and that Plaintiff Eaton was covering it up." Id. ¶ 44.

On January 18, 2017, Eaton met with Smart and Kreidler. Id. ¶ 47. During this meeting, "Defendant Kreidler threatened Plaintiff Eaton, repeatedly stating that Plaintiff Eaton should be

criminally charged and that if he had been Town Manager he would have already fired Plaintiff Eaton." Id. At this meeting, "Selectwoman Carolyn Smart repeatedly stated that Plaintiff Eaton was acting 'crazy.'" Id. ¶ 48. Kreidler also referred to Eaton "as being insane and stated that he had concerns regarding Plaintiff Eaton's emotional stability." Id. ¶ 50.

On February 8, 2017, "the Massachusetts Department of Criminal Justice Information Services issued a report finding that none of the Townsend Police Officers had violated the law," as they had been accused of doing by Kreidler in November. Id. ¶ 51. Two days later, on February 10, Eaton issued a press release publicizing the finding and noting that no police officers had violated the law. Id. ¶ 52. In this press release, Eaton also stated "that the BOS and Defendant Kreidler were engaged in a strategic assassination of the Townsend Police Department and the reputations of its officers." Id. Eaton asserts in the complaint that he made the statement "as a citizen commenting on a matter of public concern and with the intent of correcting the false information that [had] been placed in the public domain by the BOS and Defendant Kreidler." Id. ¶ 53. The press release was published on the Townsend Police Department Facebook page and is attached to the complaint. Id. ¶ 54.

Immediately after he issued the press release, the BOS put Eaton on administrative leave. Id. ¶ 55. On February 13, 2017, Eaton was admitted to the hospital "for approximately two weeks and diagnosed with Post Traumatic Stress Disorder" ("PTSD"). Id. ¶ 56. Eaton states that "the worsening of [his] PTSD symptoms and his hospitalization were the direct result of the harassment and hostile work environment created by Defendants Clark and Kreidler and being placed on administrative leave." Id. Eaton states that he "had first been diagnosed with PTSD in 2007 and began to suffer worsening PTSD symptoms in October 2016." Id. ¶ 57. Eaton alleges that at the time he was hired, the BOS knew of his PTSD diagnosis because he disclosed it

4

during a psychological evaluation completed as part of his hiring process. Id. ¶ 58. However, shortly after February 13, 2017, Eaton, through counsel, notified the Town that he had been hospitalized for PTSD. Id. ¶ 63.

On April 6, 2017, Kreidler sent Eaton notice that the BOS would conduct a disciplinary hearing. Id. ¶ 64. The BOS held the hearing on April 21, 2017. Id. ¶ 65. Eaton "was undergoing outpatient treatment for his PTSD and appeared at the hearing against medical advice." Id. ¶ 66. Both before and during the hearing, Eaton's counsel provided the BOS with letters from Eaton's doctors confirming that he "was being treated for PTSD and that he should not testify at his disciplinary hearing until approximately May 25, 2017." Id. ¶ 67. At the hearing, "Eaton requested that the BOS continue the hearing until a date on or after May 25, 2017." Id. ¶ 70. The BOS denied this request. Id. ¶ 73. Eaton alleges that had the hearing been continued, he would have been able to "personally participate in the hearing and to testify in his defense." Id. ¶ 80. Eaton further alleges that the hearing was a "sham," given that the BOS circulated a draft of their Findings of Fact prior to the hearing and that at the end of the hearing, they voted unanimously to accept the Findings of Fact and terminate Eaton's employment without discussion. Id. ¶ 77-81.

Eaton filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). Id. ¶ 84. He now alleges nine claims in the amended complaint: breach of contract (Count I), breach of good faith and fair dealing (Count II), federal and state claims for discrimination on the basis of his PTSD diagnosis (Counts III and IV), federal and state retaliation claims (Counts V and VI), federal and state civil rights violations (Counts VII and VIII), and intentional interference with contract or advantageous relationship (Count IX). Id. ¶¶ 85-128. Attached to the complaint, Eaton submitted his employment contract, a description of

the job duties for the Townsend Chief of Police, the November 23 press release from the BOS, the February 10 press release from him, the notice of administrative leave he received from the BOS, the notice of the disciplinary hearing he received from the BOS, the Findings of Fact from his disciplinary hearing, his official notice of termination, and his MCAD complaint. Doc. No. 22-1.

The defendants have collectively moved to dismiss part of the amended complaint. Doc. No. 25. They moved to dismiss three of the four possible theories of discrimination in Counts III and IV but concede that the amended complaint plausibly states a claim under one theory. Id. at 4-11. They also moved to dismiss both retaliation claims (Counts V and VI), both civil rights claims (Counts VII and VIII), and the intentional interference with contract or advantageous relationship claim (Count IX). Id. at 11-25. Eaton opposed. Doc. No. 32. The Court heard arguments from the parties on February 20, 2019.

II.     LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must provide fair notice to the defendants and state a facially plausible legal claim." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011). In other words, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted); see also Fed. R. Civ. P. 8(a). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (citation omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679 (citation omitted). This "highly deferential" standard of review "does not

mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992).

III. DISCUSSION

A. Civil Rights Claims

Count VII asserts a claim against Kreidler and Clark for violations of 42 U.S.C. § 1983. Doc. No. 22 ¶¶ 114-20. Count VIII asserts a claim against Kreidler and Clark for violations of the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I. MCRA is "coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not." Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985). Additionally, MCRA is limited to cases in which the "derogation of secured rights occurs by 'threats, intimidation or coercion.'" Bell v. Mazza, 394 Mass. 176, 182 (1985) (quoting Mass. Gen. Laws ch. 12, § 11H).

Eaton asserts two theories of constitutional violations. First, he asserts that his First Amendment rights were violated when he was placed on administrative leave and terminated due, in part, to the press release he issued on February 10, 2017. Second, he asserts that his Fifth and Fourteenth Amendment rights were violated when he was denied a genuine hearing prior to his termination. Defendants move to dismiss both theories on grounds of qualified immunity and on the merits.

1. First Amendment Claim

"In Garcetti, the Supreme Court held that public employees do not speak as citizens when they 'make statements pursuant to their official duties,' and that accordingly, such speech is not protected by the First Amendment." Decotiis v. Whittemore, 635 F.3d 22, 30 (1st Cir. 2011)

7

(quoting Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)); see also O'Connell v. Marrero-Recio, 724 F.3d 117, 123 (1st Cir. 2013) ("[T]he threshold inquiry is whether [the plaintiff] spoke as a *citizen* on a matter of public concern. A dispositive factor in this determination is whether the speech underlying [the plaintiff's] claim was made pursuant to her official duties.") (emphasis in original). The First Circuit has held that the determination of a plaintiff-employee's official duties demands a practical, rather than formal, inquiry, focusing on what duties the employee is expected to perform and not only on the formal list of duties in the job description. Decotiis, 635 F.3d at 30. In determining whether the speech was made pursuant to the employee's official duties, the First Circuit has enumerated several non-exclusive factors:

> whether the employee was commissioned or paid to make the speech in question, whether the speech was made up the chain of command, whether the employee spoke at her place of employment, whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it official significance), whether the employee's speech derived from special knowledge obtained during the course of her employment, and whether there is a so-called citizen analogue to the speech.

Id. at 32 (citations and internal quotation marks omitted).

In this case, it is clear from the amended complaint that Eaton has not stated a plausible claim for a First Amendment violation. Though Eaton states that he, as "a resident of Townsend, made the statement as a citizen commenting on a matter of public concern and with the intent of correcting the false information that [had] been placed in the public domain by the BOS and Defendant Kreidler," Doc. No. 22 ¶ 53, such a statement is entirely conclusory and not entitled to the general presumption of truth on a motion to dismiss. Instead, the Court looks to the specific facts which Eaton pled, as well as the description of job duties and the press release itself, both of which he attached to the amended complaint, Doc. No. 22-1 at 9-12, 16-18.

The following are the factual allegations in the amended complaint which relate to the February 10 press release:

> On February 10, 2017, Plaintiff Eaton issued a press release publicizing the DCJIS finding that no police off[ic]ers had violated the law. Plaintiff Eaton's press release also stated his opinion that the BOS and Defendant Kreidler were engaged in a strategic assassination of the Townsend Police Department and the reputation of its officers. A copy of the February 10, 2017 press release is attached hereto as Exhibit "D."
>
> Plaintiff Eaton, who was a resident of Townsend, made the statement as a citizen commenting on a matter of public concern and with the intent of correcting the false information that had been placed in the public domain by the BOS and Defendant Kreidler.
>
> The February 10, 2017 press release was published on the Townsend Police Department Facebook Page and was published by at least one newspaper. The Townsend Police Department Facebook Page is available online for the public to both read and post comments.
>
> Immediately after Plaintiff Eaton issued his press release, the BOS placed Plaintiff Eaton on administrative leave. A copy of the administrative leave notice is attached hereto as Exhibit "E."

Doc. No. 22 ¶¶ 52-55.

The actual press release itself, Doc. No. 22-1 at 16-18, appears with the Townsend Police Logo prominently displayed at the top. The words "Chief of Police" appear in bold lettering under "Townsend Police Department" and Eaton's name. Eaton is listed as the person to contact and his department email is listed below his name (reaton@townsendpd.org). The press release ends in large, bold words which read, "A Message from the Townsend Police Department." In the press release, Eaton includes the following language:

> After conducting my own internal investigation into allegations of misconduct and/or criminal activity by my officers, I am obligated to enforce and comply with Massachusetts General Laws (M.G.L.), Townsend Police Department Internal Policies and Procedures, my job description and contract while serving the Town of Townsend as their Chief of Police and further, to the Commonwealth of Massachusetts as a sworn law enforcement officer. . . . As the Chief of Police, I cannot stand idle and allow that to happen as it would be considered neglectful

9

> towards ethical principles and my integrity. . . . As a chief law enforcement officer, it is my lawful obligation to release credible and factual information that clears anyone from being wrongly accused.

Id. at 16-17.

Finally, the following duties and responsibilities are included in the Townsend Chief of Police job description, submitted by Eaton: "establishes operating policies and procedures and rules and regulations for the police and communications departments," "[p]lans the development of long-range and short-range goals for the department in all areas of police operations and communications operations," "[m]onitors compliance with all state, federal, and local laws and regulations," "[t]he employee has ongoing contact with the general public . . [c]ontact is by telephone, e-mail, in writing and in meetings with groups and individuals," "[a]bility to establish and maintain harmonious and productive working relationships with . . . the general public," "strong oral and written communication skills." Id. at 9-12.

Consideration of each of the six factors enumerated by the First Circuit strongly counsel in favor of a finding that Eaton was not speaking as a citizen when he wrote and issued the press release. The three most salient factors in this case are that the speech occurred at Eaton's place of employment, that it gave objective observers the impression that he represented the Townsend Police Department, and that it derived from special knowledge obtained during the course of his employment. First, the Court accepts as true Eaton's allegation that the press release was issued on the Townsend Police Department Facebook page. See Doc. No. 22 ¶ 54. This fact suggests that the press release was published, in a sense, at Eaton's "place of employment." That is, it appeared on a page run by the Townsend Police Department, similar to appearing on the

Department's official website.[3]  This fact weighs in favor of determining that the press release was issued pursuant to Eaton's official duties.

Second, the format and text of the press release unquestionably gave objective observers the impression that Eaton represented the Townsend Police Department, thus lending the speech official significance.  The Townsend Police Department logo, the prominently displayed title of "Chief of Police," and Eaton's official email address all appear at the top of the first page.  Additionally, the text of the press release conveys the impression that Eaton is speaking as the Chief of Police, thus representing the Townsend Police Department, rather than as a private citizen.  Eaton stated that he was publicizing the findings based on an investigation he conducted as Chief of Police, and that he was issuing the press release pursuant to his legal and ethical duties as Chief of Police.  Therefore, both the format and the text of the press release counsel in favor of a finding that the press release was issued as part of Eaton's official duties.

Third, the information Eaton disclosed in the press release was clearly derived from special knowledge which he obtained as part of his employment as Chief of Police.  He stated that the findings were based on his "own internal investigation into allegations of misconduct and/or criminal activity by [his] officers," "a recent ruling [he] received . . . from the Commonwealth of Massachusetts Department of Criminal Justice Information Services," and "reports from officers."  Doc. No. 22-1 at 16-17.  The very fact that he issued a press release publicizing the findings from his internal investigation and the CJIS report demonstrates that the

---

[3] Though Eaton also alleges in the amended complaint that the "Townsend Police Department Facebook Page is available online for the public to both read and post comments," he does not allege that he posted the press release as a public comment on the page.  Doc. No. 22 ¶ 54.  Posting something as a comment on a Facebook page belonging to another gives a different impression than posting original content on one's own page.  Regardless of how it was posted on the page, the content and appearance of the press release itself demonstrates that Eaton was speaking as Chief of Police, not as a private citizen.

information they contained was not publicly available and was obtained by him as Chief of Police. Again, these facts weigh in favor of finding the press release was issued pursuant to Eaton's official duties.

The other factors either point in the same direction or are neutral. Though Eaton was not specifically paid to make the press release, his job description and common sense demonstrate that he was responsible for some communication with the public on behalf of the Townsend Police Department. A press release certainly falls within the bounds of such reasonably anticipated communication. Additionally, there is no citizen analogue to the speech given that it was made to publicize internal department findings, which suggests it was made pursuant to Eaton's official duties. Finally, the question of whether the speech was made up the chain of command is at best neutral in this case. Though there is no evidence that Eaton got any sort of approval to issue the press release, as Chief of Police, he would likely not be expected to get such approval. In balancing the text and format of the press release with the practical and formal job requirements of a Chief of Police, and in using the factors enumerated by the First Circuit as guidance, the Court finds that Eaton has failed to plausibly state a claim that the press release was made in his private capacity. Accordingly, Eaton has not stated a plausible claim that the speech was entitled to First Amendment protections. The motion to dismiss is ALLOWED on Counts VII and VIII as to the First Amendment claim.

2. Due Process Claim

"[P]ublic employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process." Gilbert v. Homar, 520 U.S. 924, 928–29 (1997). Here, there is no dispute that Eaton had a property interest in his employment; the only dispute is to whether he was provided with due process

before he was terminated. The First Circuit has held that "public employees are ordinarily entitled to notice of the reasons for a proposed termination, an explanation of the evidence supporting those reasons, and an opportunity to give their side of the story at a pre-termination hearing." Jones v. City of Boston, 752 F.3d 38, 56–57 (1st Cir. 2014). This "pretermination hearing should provide 'a meaningful opportunity to invoke the discretion of the decisionmaker,' both as to the facts supporting the termination and as to its broader appropriateness." Id. at 57 (quoting Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 543 (1985)).

Eaton received notice of his opportunity to have a disciplinary hearing on April 6, 2017, which contained the reasons for the proposed termination. Doc. No. 22-1 at 22-25. The hearing was held on April 21, 2017, at which time the case against Eaton was presented by Town Counsel to the BOS. Doc. No. 22 ¶¶ 65, 76. Eaton appeared at the hearing, accompanied by counsel. Id. ¶¶ 66, 72. At the conclusion of the presentation by Town Counsel, "the BOS, without any discussion, voted unanimously to terminate Plaintiff Eaton's employment as Townsend Chief of Police." Id. ¶ 81. The amended complaint does not allege that Eaton presented any evidence or argument at the hearing, either himself or through counsel, or that the BOS precluded him in any way from doing so. However, he does allege that both before and during the hearing, his counsel provided the BOS with letters from his doctors "confirming that Plaintiff Eaton was being treated for PTSD and that he should not testify at his disciplinary hearing until approximately May 25, 2017." Id. ¶ 67.

Additionally, Eaton alleges that the hearing was a sham and that the BOS had already decided to terminate him before the hearing. [4] See id. ¶¶ 77-80. In support of this assertion, Eaton presents four facts: 1) "the BOS circulated a draft of their Findings of Fact of the BOS to Plaintiff and the public before the hearing actually started," 2) "the BOS voted to accept the Findings of Fact of the BOS without any discussion or modification after the presentation of the purported evidence," 3) "the BOS voted to terminate Plaintiff Eaton's employment without any discussion after the presentation of the evidence," and 4) "the BOS refused to continue the Disciplinary Hearing to allow Plaintiff Eaton to personally participate in the hearing and to testify to the decision." Id.

Based on these assertions, the Court concludes that Eaton has, at this stage, alleged sufficient facts to survive the motion to dismiss on Count VII (the § 1983 claim) on the theory that the hearing was a sham.[5] However, Eaton may only seek to hold liable the individuals who were directly responsible for any alleged due process deprivation, that is, the BOS.[6] Kreidler was the Town Administrator at all relevant times and, by Eaton's own admission, took no part in

---

[4] In their motion to dismiss, defendants argue against the potential theory that Eaton was denied due process by the denial of his request for a continuance. At the hearing, counsel for Eaton clarified that he is not asserting the denial of a continuance as a second theory of a due process violation. Therefore, the Court concludes that Eaton has alleged only one theory under his due process claims: that the hearing was a sham and thus violated his right to due process.

[5] At the hearing, counsel for Eaton advised the Court that the remedy sought for the alleged violation of due process is a vacatur of the BOS decision to terminate Eaton and backpay under the contract for all the time since that decision. Nothing in the Court's decision is an endorsement of this theory or a resolution of the question of what the appropriate remedy is, as that question is not now before the Court. Cf., Zinermon v. Burch, 494 U.S. 113, 126 (1990) ("The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.")

[6] At the February 20, 2019 hearing in this case, counsel for the defendants conceded that they are not raising a qualified immunity defense insofar as the due process claim alleges a theory that the hearing was a sham.

the actual disciplinary hearing itself.  At the February 20, 2019 hearing in this case, counsel for Eaton clarified that his only theory for holding Kreidler liable on the due process claims is that he "encouraged" the BOS to fire Eaton.  However, it is undisputed that Kreidler did not participate in the hearing itself.  Under the theory that the hearing was a sham, Eaton cannot seek to hold liable a person who was not there, was not involved in the decision-making process, and who owed him no duty to provide a meaningful hearing.  The motion to dismiss is therefore ALLOWED on Count VII as to the due process claim against Kreidler.

As previously noted, liability under MCRA only attaches where the "derogation of secured rights occurs by 'threats, intimidation or coercion.'"  Bell, 394 Mass. at 182 (quoting Mass. Gen. Laws ch. 12, § 11H).  In this case, though Eaton has alleged numerous threats and intimidating statements made to him by Kreidler and Clark, he has alleged no facts upon which the Court could conclude that such threats or intimidation led to a due process violation.  For example, Eaton has not alleged that he was threatened to not participate in the hearing or that the BOS made its decision based on any internal or external threats, intimidation, or coercion. Accordingly, he has not plausibly stated a claim for relief under MCRA.  Therefore, the motion to dismiss is ALLOWED on Count VIII.

B. Discrimination Claims

Count III asserts a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.  Doc. No. 22 ¶¶ 93-99.  Count IV asserts the parallel state claim under Mass. Gen. Laws ch. 151B, § 4(16).  Id. ¶¶ 100-106.  The parties agree that the same analysis applies to both the federal and state claims; accordingly, the Court analyzes them together.

As the defendants note in their memorandum in support of the motion to dismiss, Doc. No. 26 at 3-4, Eaton appears to allege four theories of discrimination under Counts III and IV:

(1) failure to provide reasonable accommodation; (2) failure to engage in an interactive process to address his health concerns; (3) creation of a hostile work environment; and (4) terminating his employment on the basis of his disability. The defendants move to dismiss the first three theories on the basis that the amended complaint does not plausibly state a claim for relief but concede that it does plausibly state a claim under the fourth theory. Id. at 3-11. The Court concludes that the amended complaint plausibly states a claim on each of the four theories. However, one point relating to the hostile work environment claim bears mention.

> To plausibly state a hostile work environment claim, a plaintiff must allege
>
> (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership of the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Hines v. Bos. Pub. Sch., 264 F. Supp. 3d 329, 335 (D. Mass. 2017) (quoting Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 39 (1st Cir. 2007)). In the amended complaint, Eaton pleads the following: "Sometime shortly after the November 19, 2016 phone call between Plaintiff Eaton and Selectwom[a]n Carolyn Smart, Defendant Kreidler became aware of the complaints and concerns that Plaintiff Eaton raised to Selectwom[a]n Carolyn Smart about Defendant Kreidler. Defendant Kreidler's harassment towards Plaintiff Eaton noticeably intensified." Doc. No. 22 ¶ 41. At the hearing, counsel for Eaton conceded that the hostile work environment claim relates only to the period of time after the November 19 phone call where Eaton first made a request for accommodation. On this theory, the Court finds that Eaton has plausibly alleged that <u>after</u> he made the request for an accommodation to Smart on November 19, Kreidler became aware of his PTSD diagnosis and subjected him to unwelcome harassment as a result.

IV.     CONCLUSION

The Court concludes that in all other respects, the amended complaint plausibly states a claim.  Therefore, the motion to dismiss, Doc. No. 25, is ALLOWED on Count VIII.  It is ALLOWED on Count VII insofar as it asserts a claim for a violation of Eaton's First Amendment rights, and insofar as it asserts a claim for a violation of Eaton's right to due process against Kreidler.  It is DENIED in all other respects.

The scheduling order issued by the Court, Doc. No. 43, remains in effect.

                                        SO ORDERED.


                                         /s/ Leo T. Sorokin
                                        Leo T. Sorokin
                                        United States District Judge